## DECLARATION OF DILLARD HUGHES

STATE OF GEORGIA

COUNTY OF GWINNETT

DILLARD HUGHES declares and affirms that the following statements are true:

1.

My name is Dillard Hughes.   I am more than 18 years old and legally competent to give this Declaration.   The statements in this Declaration are based on my personal knowledge.

2.

I am a Major with the Gwinnett County Sheriff's Office.  I am the Support Section Commander at the Gwinnett County Jail ("Jail") and have been employed in this capacity since May of 2013.  I am in charge of many of the day to day operations of the Jail.

3.

I give this Declaration in support of my and the other defendants' response to plaintiff Adam Garber's motion for injunction.   My understanding is that Garber seeks to enjoin the Sheriff's Office from continuing with the following practices:  1) not allowing inmates to watch news shows on TV, or to receive

newspaper subscriptions; 2) returning to sender non-permitted mail items; 3) allowing incoming mail only on postcards; and 4) serving breakfast at 4:00 a.m., which supposedly keeps Garber from having 6 hours of uninterrupted sleep at night. My declaration will address and explain the reasons for each of these practices.

4.

Inmates are not allowed to watch news shows unless prior approval has been granted by the Jail Administrator. This is stated in the Jail Housing Unit Manual, under Basic Guideline for Housing Units, Section Nine, "Free Time." Ex. 1. The reason inmates are generally not allowed to watch news shows is because this could present a security risk for the Jail. News shows often have coverage of crimes allegedly committed by inmates housed in the jail. Based on my experience, inmates charged with certain crimes (e.g. rape, child molestation, domestic violence, child abuse) can be in danger of harm from other inmates. If inmates heard on news shows about these type crimes committed by other inmates, this could put the other inmates in danger. By not allowing inmates to watch news on television, this potential danger is lessened.

5.

Although I am not aware of any requirement that inmates be allowed to watch television at all, the Sheriff's Office nevertheless allows television watching, and inmates are allowed to watch a variety of other non-news shows and sports on television.

6.

The Jail does not allow inmates to receive newspaper subscriptions.   Again, inmate safety is one of the reasons for this practice.   Newspapers often have coverage of crimes allegedly committed by inmates housed in the jail (for example, Garber's case has received coverage (See Ex. 2)), and if inmates read about other inmates being charged with certain crimes, this could expose inmates to danger, and also expose Sheriff's Office personnel to danger.

7.

As another example, the Sheriff's Office used to allow subscriptions to the USA Today.  An article appeared in the paper about Lynn Turner, an inmate in the jail who had become of great interest to the media because she murdered three husbands by putting antifreeze in their food. We did not want the general population to know the details of her charges as we feared other inmates may take offense to that type of crime.

8.

If an inmate is identified by other inmates because of news coverage, the Jail would likely be forced to safeguard that inmate in protective custody. This would require a one person cell and more security than is available. Allowing newspapers into the Jail could result in a ripple effect of requiring more single inmate cell space and additional personnel, neither of which the Sheriff's Office has the budget for.

9.

Newspapers also present a fire hazard. They are a great source of fuel for fires that could place every inmate and staff member in danger. Based on experience, the composition of newspapers makes them much easier to ignite than regular soft back books or magazines (both of which are allowed in the Jail).

10.

Newspapers also take up a lot of space. Most newspapers publish seven days a week, which means the papers would quickly accumulate in inmates' cells. Inmate property items in cells are limited in number so that cells can be kept clean, orderly, and easy to search. Accumulation of newspapers in a cell would require extra personnel time to clear out the papers, and cause difficulty for officers or medical personnel that need to be in the cell but would not be able to efficiently

move around the cell because of the clutter.   We often have problems with inmates who try to flush food wrappers or other items down the toilet, which creates flooding problems and even bigger problems in the system.  An accumulation of newspapers would give an inmate who wants to cause disruption an easy item to put in his toilet and cause flooding and even damage to the sewer system in the Jail.

11.

For all of these reasons, inmates are not allowed newspaper subscriptions.

12.

Inmate mail is governed by Jail Policy Number 13.A (Ex. 3).  Garber states in his complaint that sometimes items mailed to him are returned to sender without prior notice to Garber.

13.

Whenever any item of mail is returned to sender, the inmate is notified by receipt of a "Gwinnett Detention Center Returned Mail Notification."   In fact, Garber attached a Notification as an exhibit to his complaint (Ex. 4 to Declaration, which is also Document 12-1, page 1 of 10).  The notification is addressed to Garber and dated, notes his housing unit number, lists the specific item that was

returned, the reason why it was returned, and notifies Garber that if he disagrees with the mail being returned he can file a grievance to appeal the decision.

14.

This is exactly how the process works. Garber could have appealed the decision to return this mail item.

15.

I am not aware of Garber appealing this or any other decision to return mail.

16.

Garber has also sued regarding the Jail's post-card only policy for incoming mail.   This policy was implemented in 2010.   I am not aware of any court in this Circuit finding such a policy to be unconstitutional.

17.

The post-card only policy is in place for a variety of reasons.   By limiting the space in which inmate and others can converse, the policy by its nature impedes the ability to conceal illegal schemes in long correspondence, such as escape plans, and plans to introduce illegal items and contraband into the Jail. Inmate receipt of contraband has and will continue to be an issue at this and every Jail.  The postcard policy makes it near impossible to transmit contraband through

the mail.   Additionally, the policy conserves limited jail resources because

personnel is not required to open and sort every piece of mail that comes into the

Jail.   This allows personnel to spend time on activities that better serve the Jail's

goal of providing a safe facility for both inmates and Jail employees.   Allowing

multi-page sealed letters would significantly increase the time spent processing

mail, which would detract from time spent on responsibilities that ensure a safe

and secure Jail.

18.

Finally, Garber in his lawsuit claims that he is being deprived of sleep, and

asks for an injunction so that he can get an uninterrupted six hours of sleep per

night.   I am not aware of any constitutional right to a particular amount of

uninterrupted sleep during a specific time interval, but as a factual matter Garber

can get six hours of sleep per night if he chooses.

19.

An inmate's typical daily schedule is set out in the Jail Housing Manual,

Basic Guidelines for Housing Units, Section 24, "Typical Daily Schedule."  Ex. 5.

Final lights out at the Jail is at 12:00 a.m., although an inmate can go to sleep well

before 12:00 a.m. if he chooses.

20.

Breakfast is served at 4:00 a.m.  Every day a large number of inmates are transported from the jail to the County courthouse, which is several miles away. Court can start as early as 8:00 a.m.   Serving breakfast at 4:00 a.m. is the most efficient time because it gives inmates who choose to eat breakfast time to eat, get prepared for transport, and arrive at the courthouse before court hearings start.

21.

Inmates are not required to come out of their cells at breakfast time.   If an inmate chooses, he can continue sleeping during breakfast time.

22.

Lunch is served starting at 12:00 p.m.   Dinner is served starting at 4:00 p.m. After dinner and before lights out, inmates are not regularly scheduled for any required activities.  An inmate can sleep at any time after dinner up until breakfast the next morning.

23.

Inmates if they choose can sleep many more than six hours each day.   An inmate can go to sleep before lights out and get at least six hours of sleep at night,

even assuming the inmate is woken up every day at 4:00 a.m.   If an inmate chooses to remain in his cell at breakfast time he could sleep in excess of eight hours every night even if he did not go to sleep until final lights out time at 12:00 a.m.

24.

Garber has made many medical-related complaints (he has filed at least 12 formal grievances on a variety of matters, some of them medical-related) during his time at jail.   However, I am not aware of him ever complaining that he was being deprived of sleep.

I declare the foregoing under penalty of perjury, this ___5___ day of April, 2015.

Dillard Hughes

of in the unit trash receptacles. Receptacles have been placed in each housing unit to promote recycling throughout the facility. Staff shall direct inmates to use the recycling bins properly when discarding cardboard and paper items.

Inmates who are out of the unit (i.e., court, internal/external appointment) are to eat upon their return to the unit. You must ensure meals are saved for those inmates.

After everyone has eaten, cleanup is to be completed by the inmate unit workers. Trays and trash should be placed outside the housing unit for pickup by maintenance staff.

## 8.   Cell Searches

Each deputy is required to perform a minimum of three cell searches per shift. The primary focus of cell searches is to locate and confiscate contraband and/or excessive items. A shift log entry of the searches and items found shall be made and the cell search log, normally located in the deputy restroom, must be annotated. Throughout the shift, informal cell inspections shall be performed to ensure inmates maintain a neat and sanitary housing area. Maintenance shall be notified of any cell damage.

## 9.   Free Time

Inmates will generally be allowed the maximum amount of daily free time in accordance with the facility's free time schedule. During free time, inmates may have access to the day room, outside recreation area, television, showers, and inmate telephones. You should monitor inmates' behavior and noise level, along with their telephone and television usage. Inmates are not permitted to view local, national, or world news unless prior approval has been granted by the Jail Administrator or his designee. Inmates' conversations shall be audible only to those in the immediate area. Inmates who become too loud or unwilling to remain cooperative will be restricted to their cells.

The A/B schedule shall be adhered to for designated housing units. If free time is curtailed, a shift log entry detailing the reason(s) for loss of free time shall be made.

## 10.   Recreation Area

You shall observe the recreation area when inmates are outside. Inmates will not be allowed to participate in group activities, such as basketball and volleyball, after 2000 hours.

You shall ensure inmates' noise/conversation tone is audible only to those in the immediate recreation area. You are responsible for monitoring recreational activities and immediately addressing inmates' disruptive behavior.


EXHIBIT
1

14

# Brutal testimony against mom, boyfriend charged in toddler's murder

### Want daily summaries and Breaking News alerts?

By **Tyler Estep**
tyler.estep@gwinnettdailypost.com

As of Tuesday, December 31, 2013
© Copyright 2015 Gwinnett Daily Post



Adam Garber

LAWRENCEVILLE — Aiden Calvo's older brother, just 5 years old, told police that his mom's boyfriend played a simple game. If the mood struck him, 25-year-old Adam Garber would assign each side of a coin to one of the young brothers and toss it in the air.

Whichever child lost would get beaten.

A probable cause hearing in front of a Gwinnett County magistrate judge Tuesday morning painted Garber and Elizabeth Calvo as having a history of violence against both of Calvo's children. Gwinnett County police Det. Sheila McMillan testified that their disdain was addressed especially toward 2-year-old Aiden — whose murder the couple is now charged with.

"Aiden got all the injuries because Aiden couldn't talk," McMillan said, relaying what Calvo reportedly told a cellmate at the Gwinnett County jail.

Five-year-old Richard Calvo reportedly woke the couple up early on the morning of Dec. 16 after he realized his brother couldn't be stirred. Blood covered the walls and sheets in their bedroom at Norcross' Steeplechase Apartments, as if Aiden had "coughed up blood" everywhere, McMillan said.

Garber called 911 that morning, both he and Calvo, 21, claiming not to know anything about the toddler's injuries.

But even before the 2-year-old succumbed to a brain bleed — believed to be caused by what's known colloquially as shaken baby syndrome — Garber's story changed. He reportedly turned on Calvo during police interviews, blaming the abuse on her.

Garber told police he had seen Calvo hitting Aiden with "something wrapped in a towel." McMillan said detectives later found a bar of soap zip-tied in the bottom of a garbage bag inside the couple's apartment, where they had lived for only about two days after moving down from New York.

The Internet history on Garber's cellphone, though, brought his own demons to light.

In addition to Google searches like "my child won't wake up" and "pupil size" with timestamps beginning on the evening of Dec. 15, Garber also had been researching different methods of human torture as far back as November, McMillan said.

One search simply said, "I can't stop hitting my kid."



EXHIBIT

2



Elizabeth Calvo

Doctors and the Gwinnett County Medical Examiner's Office believe Aiden was chronically abused, due especially to bruises across his body being in "various stages of healing." Calvo, her long hair several shades of red, began crying Tuesday as McMillan rattled off the various injuries discovered.

They included: "several fingerprint bruises" on his back; a hand print on his buttocks; a bruised jaw; forehead bruising; a fractured skull; bleeding in his nose and stomach; bruising to his penis and scrotum; bite marks to his fingers; diaper rash with skin breakdown, "possibly from scalding"; and a subdural hematoma causing bleeding to his brain.

Blood was later found in several of Aiden's used diapers.

McMillan said one woman has come forward, claiming she called Child Protective Services in New York in 2009 for an incident involving Calvo and Richard, Aiden's now-5-year-old brother. Garber reportedly told police he had called also called CPS recently while he was living in Las Vegas with his father.

He said he "would hear thumps in the background" while on the phone with Calvo, McMillan said.

Calvo was granted full custody of her children in March after a battle with her estranged husband, their biological father. Gwinnett County police have since interviewed him.

"He said that (Calvo) never liked the kids or wanted the kids, she just took them to spite him," McMillan said.

Calvo reportedly told detectives that Aiden "got the bruises when in the care of Adam." Her mother and sister said that the toddler would "run away from Adam" when he saw him.

Murder and child cruelty charges against Calvo and Garber were bound over the superior court Tuesday. Both are being held without bond.

## Sponsored From Around the Web



Remove Your Eye
Bags Instantly



New Testosterone
Booster Takes
GNC by Storm



Controversy Over
New Safe "Steroid
Alternative"



New Fat Burner
Takes GNC by
Storm



Stop "Googling"
Their Name for
Info, Here's Why

?

| | Policy Number | Pages: 7 |
|---|---|---|
| **Gwinnett County Sheriff's Department** <br><br> **Jail Division** | *13.A* | |
| **Chapter 13:** Communications, Mail and Visitation | ***Related Standards:*** <br><br> 4-ALDF-5B-05 THROUGH 4-ALDF-5B-10 <br><br> Georgia Sheriff's Association Standards 16.01 – 16.07 | **Revision Date** <br><br> 12/14/2010 |
| **Subject:** **Inmate Mail Procedures** | | |

I.  **AUTHORITY**

The authority of the Jail Commander to issue this document is contained in Chapter One, Policy 1.A, which delegates authority from the Sheriff to the Jail Commander to manage all programs, activities, inmates, personnel, and volunteers associated with the Gwinnett County Jail.

II.  **PURPOSE**

To establish procedures and guidelines for the processing of incoming and outgoing correspondence for inmates of the Gwinnett County Jail.

III.  **APPLICABILITY**

All inmates and staff members responsible for the inspection, collection and distribution of inmates' incoming and outgoing correspondence.



EXHIBIT

tabbies

**3**

## IV.   DEFINITIONS

**Censor** - Deletion of any communication or part thereof where it has been determined by the facility staff that such materials contain information that may endanger the facility's security and good order.

**Correspondence** – Written communication to or from inmates.

**Indigent Inmate** - An inmate with no funds or source of income.

**Legal Correspondence** - Communication between inmates, government officials, court officials, attorneys or consulate representatives. Staff members' ability to access, monitor and censor these communications are limited.

**Special Management Inmates** – Inmates whose behavior presents a threat to the safety and security of the facility, staff, general inmate population or themselves. Special handling and/or housing is necessary to closely monitor their behavior.

## V.   POLICY

It shall be the policy of the Gwinnett County Jail to allow inmates to receive or send correspondence in accordance with all applicable statutes and facility regulations, unless the safety or security of the institution, staff, visitors, or other detainees would be jeopardized by such correspondence.

## VI.   GENERAL PROCEDURES

A.   All incoming mail with the exception of legal mail, Money Orders or Cashier's Checks must be in the form of a metered/stamped postcard (Minimum size: 3.5 inches by 4.25 inches. Maximum size: 4.25 inches by 6 inches).

B.   Postcards in the following form will not be accepted:

1.   Defaced or altered postcards
2.   Plastic or wrapped postcards
3.   Postcards marked with paint, crayon, or marker
4.   Postcards with any type of labels or stickers
5.   Postcards with watermarks or stains
6.   Postcards with biohazards including perfume or lipstick
7.   Postcards depicting nudity, weapons, or gang references
8.   Oversized postcards

9.    Postcards written in code

Unacceptable postcards will be returned to the sender.

C.    With the exception of legal correspondence, letters contained within an envelope **will not be accepted**.

D.    Photographs contained in an envelope **will not** be accepted.  The acceptance of photographic images in a postcard form is authorized (provided they are mailed in as a postcard)

E.    In the event the volume of correspondence being sent by an inmate disrupts the orderly operation of a housing unit, the Jail Commander may place limitations on the inmate's correspondence privileges.   The inmate will be notified in writing by the Jail Commander if any such limitations are imposed.

F.    Inmates are permitted to mail sealed letters to addressees outside the jail facility.  The inmates' full name, inmate identification number and complete facility mailing address must be written in black ink on the outside of the envelope.

The envelope cannot have any drawings, writings, graffiti or additional markings on the outside.  If the envelope does not conform to this rule, it will not be accepted by the housing unit deputy for mailing.

G.    Newspapers will not be accepted.

H.    Magazine subscriptions and books will be accepted as long as they are mailed directly from the publisher or an authorized retailer.  Family members are not permitted to mail or deliver reading material to the facility for an inmate.

I.    Hardbound books **will not** be accepted.

J.    Inmates in special management units can write and receive correspondence on the same basis as inmates in general population.

K.    Excluding weekends, holidays and emergency situations, incoming and outgoing correspondence are held for no more than 24 hours and packages are held for no more than 48 hours.

L.    Upon written request, indigent inmates will receive sufficient postage and stationary to maintain family and community ties and for legal correspondence.

M.   Inmates shall be notified in writing when incoming mail has been confiscated based on facility regulations.

N.   Religious printed material (pamphlets, booklets, etc) received from a religious organization will be accepted.  Correspondence accompanying the religious printed material will be subject to the procedures and guidelines set forth in Section VI "General Procedures".  Religious material received from family members will **not** be accepted.

In the event the volume of religious material in an inmate's possession disrupts the orderly operation of a housing unit, the Jail Commander may impose limitations.  The inmate will be notified in writing by the Jail Commander if limitations are imposed.

O.   All Unacceptable items will be returned to the sender.

## VII.   Outgoing Mail

A.   Outgoing mail shall be collected by the housing unit deputy at the end of each shift.  Collected mail shall be deposited in the designated inmate mail drop off area.  Outgoing mail shall not be held for more than 24 hours.

B.   Outgoing mail will be intercepted if staff members receive credible information that a letter may contain information that would jeopardize the security of the facility, staff or the general public.

C.   Inmate to inmate mail must be on a metered post card.

D.   The inmate's full name, inmate identification number and complete mailing address of the Gwinnett County Jail must be written in black ink on the envelope or metered post card of all outgoing mail.

Envelopes or metered post cards cannot have any drawings, graffiti or additional markings.  Outgoing correspondence not in accordance with facility guidelines will not be accepted by the housing unit deputy for mailing.

E.   Excluding legal correspondence, all outgoing mail may be inspected and reviewed to determine if the safety and security of the facility is threatened.

VIII.   <u>Incoming Mail</u>

A.   Incoming mail will be delivered to the housing units within 24 hours of receipt except for weekends and holidays.

B.   Incoming mail shall be delivered to the addressee only.   Mail shall be retained by the housing unit deputy if the inmate is temporarily out of the housing unit.  If the inmate is no longer incarcerated by the Gwinnett County Jail, deputies shall write "ATW" on the correspondence and placed in the designated inmate mail drop off area at the end of shift.

C.   Mail addressed to an inmate who has been transferred or released from the Gwinnett County Jail will be returned to the sender within 48 hours of receipt.

D.   All incoming mail must contain a complete return address and the sender's name.  Mail received without the sender's name or an incomplete return address will be reviewed and destroyed within 30 days.


IX.   <u>Legal Correspondence</u>

A.   For incoming mail to be processed as legal mail, it shall be clearly marked as being sent from an attorney, court official, government official or consulate.

B.   Legal mail shall be delivered to the inmate <u>unopened</u> in the sealed envelope.

C.   Without exception, legal mail shall be opened and inspected in the <u>inmate's presence</u>.  When inspecting legal mail, the housing unit deputy shall check the legal documents to ensure contraband has not been concealed in the envelope.  <u>The inspection of all legal documents shall be conducted in the inmate's presence</u>.  <u>Staff members shall not read or censor inmates' legal correspondence.</u>

D.   During normal business hours, attorneys may deliver legal documents to the mail room.  Mail room staff will ensure the immediate delivery of all legal correspondence to inmates.

After business hours, attorneys are permitted to personally deliver legal documents to an inmate as long as it complies with all security procedures.  Following an attorney visit, the housing unit deputy shall inspect all documents delivered directly to the inmate by their attorney.

## X.   Restricted Material

Publications that contain the following are restricted and will not be delivered to inmates:

A.   Material describing, depicting or advocating disruption or violence in the facility.

B.   Materials written in code

C.   Sexual explicit material

D.   Materials that advocates racial or religious hatred or creates a serious threat of violence.

E.   Material that encourages or instructs in the commission of any criminal offense.

F.   Material that jeopardizes the security and safety of the inmates, staff, facility or the general public.

Any publication that contains any of the above listed materials will be confiscated. The inmate will be notified in writing of the confiscated item(s).

## XI.   Money

A.   Accepted forms of currency: U.S. Postal Service and Western Union Money Orders.

B.   Money orders will be accepted through the mail. Money orders must be contained in a white envelope. The inmate's name and identification number must be written on the Money order. Envelopes must be clearly marked on the outside, "For Deposit Only". If not, it will be returned to sender. If letters or photographs are contained in the envelope, it will be rejected.

C.   Cashier's Checks will be accepted through the mail for assisting an inmate with posting bond. Cashier's Checks must be contained in a white envelope. The inmate's name and identification number must be written on the Cashier's Check. The envelope must be clearly marked on the outside, "For Deposit Only".

Specific instructions regarding the utilization of the funds **must**

accompany the Cashier's Check.

D.      Cash **will not be** accepted.

## XII.     Appeal

In the event a letter is censored, the author may appeal the decision to the Jail Commander within 30 business days.  If the appeal is denied, the material may be discarded.  In the event the censorship decision is reversed, the letter is to be delivered without delay.

# GWINNETT DETENTION CENTER

# RETURNED MAIL NOTIFICATION

Garber, Adam                           B-116-B                    2/9/15

**INMATE NAME**                    **HOUSING UNIT**              **DATE**

A letter, postcard, picture(s) or **package** addressed to you was received from:
**Parker/Waichman Law Firm 6 Harbor Park Dr. Port Washington, New York**

The item(s) has **been returned to the Sender for** the following reason (s):

_____Envelopes/Stamps/Stationery          _____Books/Magazines

_____ Greeting Cards                       _____Sexually Explicit Photos

_____Stickers/Glued down Materials         _____No Return Address
                                            Mail will be put in Dead File

_____Unauthorized Money Order              XXX   Other
                                            Carbon Copy Paper
We only accept Western Union and
Postal Money Orders

f you do not agree with your mail being returned, please fill out a pre grievance form and
forward to the Inactive Records Supervisor. Please refer to the mail section of the
Inmate handbook before submitting your pre grievance.

S. Brown                                     2/9/15
Supervisor Sheriff Processing Associate                      Date

(Revised 10/4/2013)

EXHIBIT
4

## 24.  Typical Daily Schedule

Below is a typical schedule of daily activities. The A and B floors shall be alternated. Times may vary and are subject to change at the discretion of the jail staff.

| | |
|---|---|
| 0345-0400 | Wake up |
| 0400-0500 | Breakfast and clean up |
| 0500-0800 | Quiet time |
| 0800-0900 | Lights on, beds made, cells cleaned |
| 0900-1000 | Free time A |
| 1000-1100 | Free time B |
| 1100-1200 | Quiet time |
| 1200-1300 | Lunch and clean up |
| 1300-1400 | Free time A |
| 1400-1500 | Free time B |
| 1600-1700 | Dinner and clean up |
| 1700-1900 | Quiet time |
| 1900-2100 | Free time A |
| 2100-2300 | Free time B |
| 2300-0000 | Quiet time and clean up |
| 0000-0500 | Lights out |

The tower units' room security lights (reading lights) may be left on or turned off at the deputy's discretion.

**Definitions:**

**Free time:**      Access to day room, showers, inmate telephones, and outside recreation area. Noise level kept to a minimum. If on A/B schedule, one floor out at a time.

**Quiet time:**     Inmates in their assigned cells. Deputy may use this time to read and sign request forms, complete three cell searches, read shift logs, complete supply list.

## 25.  Managing Unusual Occurrences within the Unit

When an incident requiring urgent action occurs, such as a medical emergency, a fight, or the failure of an inmate who is outside his/her room to comply with instructions, you shall immediately notify Central Control of the situation via radio. All inmates shall be instructed to return to their cells.

If possible, wait for responding deputies to arrive. You should not attempt to break up a fight alone.

If an inmate must be removed from the housing unit, internal security deputies and a supervisor will conduct the removal. Inmates should be reminded that if any problems



EXHIBIT
5