**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| ADAM GARBER, | : | CIVIL ACTION NO. |
| Gwinnett Cnty. ID # 99499879, | : | 1:15-CV-00123-AT-JCF |
|     Plaintiff, | : | |
| | : | |
|     v. | : | |
| | : | |
| SHERIFF BUTCH CONWAY, | : | PRISONER ACTION |
| COL. DON PINKARD, | : | 42 U.S.C. § 1983 |
| MAJOR D. HUGHES, | : | |
| GWINNETT CNTY. DET. CTR., | : | |
|     Defendants. | : | |

**MAGISTRATE JUDGE'S ORDER AND SECOND
NON-FINAL REPORT AND RECOMMENDATION**

Plaintiff has been a pretrial detainee at the Gwinnett County Detention Center ("GCDC" or "Jail") since December 2013, "charged with murder and child cruelty for allegedly shaking to death his 2-year old son." (Doc. 22 at 2; *see* Doc. 4 at 3-4). The undersigned has conducted a frivolity review of Plaintiff's complaint, as amended, and has recommended that Plaintiff's claims be allowed to proceed regarding the Jail's policies that allegedly (1) restrict his access to world news media, (2) cause items he has received in the mail to be returned to the sender without prior notice to him or the sender, (3) restrict incoming mail to postcards only, and (4) deprive him of an adequate opportunity for sufficient sleep. (Doc. 17 at 13-14). The undersigned ordered Sheriff

Conway to respond to Plaintiff's request for a preliminary injunction regarding the foregoing claims. (*Id.* at 14; *see* Doc. 6; Doc. 10 at 2). Now before the Court are the parties' pleadings on the preliminary injunction issues (Docs. 6, 10, 22, 25) as well as Plaintiff's motion for mandamus relief (Doc. 29) and his several additional motions for miscellaneous relief (Docs. 20, 21, 23, 26, 31, 35, 36).

I. **The Legal Framework**

> A party seeking a preliminary injunction must establish that "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (*en banc*) (*per curiam*). "[A] preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' for each prong of the analysis." *Am.'s Health Ins. Plans v. Hudgens*, 742 F.3d 1319, 1329 (11th Cir. 2014) (quoting *Siegel*, 234 F.3d at 1176).

*New Wave Innovations, Inc. v. McClimond*, 589 Fed. Appx. 527, 528 (11th Cir. 2015); *see Odebrecht Constr. v. Sec'y, Fla. Dept. of Transp.*, 715 F.3d 1268, 1274 (11th Cir. 2013) (noting that, "as in so many cases, the first question is critical"); *United States v. Lambert*, 695 F.2d 536, 539 (11th Cir. 1983) ("Because a preliminary injunction is an extraordinary and drastic remedy, its grant is the exception rather than the rule, and plaintiff must clearly carry the burden of persuasion." (internal quotations omitted)).

2

"When a preliminary injunction goes beyond the status quo and seeks to force one party to act, it becomes a mandatory or affirmative injunction and the burden placed on the moving party is increased." *Mercedes-Benz U.S. Int'l, Inc. v. Cobasys, LLC*, 605 F. Supp. 2d 1189, 1196 (N.D. Ala. 2009). And

> when a party seeks to enjoin a government agency, "his case must contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own affairs." *Rizzo v. Goode*, 423 U.S. 362, 378-79 (1976). "This 'well-established' rule bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury." *Midgett v. Tri-County Metropolitan District of Oregon*, 74 F. Supp. 2d 1008, 1012 (D. Or. 1999), *aff'd* 254 F.3d 846 (9th Cir. 2001).

*Martin v. Metro. Atlanta Rapid Transit Auth.*, 225 F. Supp. 2d 1362, 1372 (N.D. Ga. 2002).

## II. Plaintiff's Motion For A Preliminary Injunction

Plaintiff has raised three claims based on alleged violations of his First Amendment rights: (1) Jail policy denies him access to world news, both in print media and on television, and to "world news newspapers . . . in the mail from the publisher." (Doc. 4 at 4); (2) "on many occasions [he] has had publications returned with a notice only stating that something came, was denied, and returned with[out his being] given [an] opportunity to appeal the denial of a letter or publication and avenue to redress the

3

issue. Often times, the notice will not say who sent the [returned item] or [will] have a name but no sender's address." (*Id.*); and (3) the GCDC "has a post-card only policy for incoming mail which limits correspondence between inmates/detainees and free world persons." (*Id.*). Plaintiff also claims that the Jail's schedule for inmates does not afford him an opportunity for 6 hours of undisturbed sleep. (Doc. 10 at 2). Plaintiff seeks a preliminary injunction to terminate the foregoing GCDC policies and practices. (Doc. 6; Doc. 10 at 2).

The Supreme Court has stated that a "regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Four factors guide the evaluation of a prison regulation: (1) whether "there [is] a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the existence of obvious, easy alternatives[, which] may be evidence that the regulation is not reasonable, but is an exaggerated response to prison concerns." *Id*. at 89-90 (internal quotations omitted).

Plaintiff argues that all of the requirements for a preliminary injunction are met

4

here because (1) he has a substantial likelihood of success on the merits of his First Amendment claims because similar claims have been successful in the Supreme Court and elsewhere (Doc. 6 at 4-5); (2) he is suffering irreparable harm in the denial of access to world news, the return of mail sent to him before he is given an opportunity to file a grievance, and the postcard-only policy that "does not allow him to properly and adequately correspond with family and friends or other free world persons" and "reduces the quality and quantity of communication between inmates and their correspondents by limiting [the] amount of space in which the sender can write" (*id.* at 2-3); (3) the balance of harm weighs in his favor because "the 'sufferings' the Defendants will experience if the Court grants [his motion] will consist of reading a letter instead of a postcard[] and giving a reply to a grievance" (*id.* at 3); and (4) the public interest is always served when jail officials obey the law (*id.* at 3-4).

### A.     Access to World News

With respect to Plaintiff's claim regarding his access to world news, Defendants respond by noting that a prisoner has no constitutional right to watch television, hence no constitutional right to watch television news. (Doc. 22 at 5). They also assert a security interest in denying GCDC inmates access to television news because "inmates charged with certain crimes (e.g. rape, child molestation, domestic violence, child

5

abuse) can be in danger of harm from other inmates," who might hear about these crimes via television news shows.  (*Id.* at 6).  "By generally not allowing inmates to watch news on television, this potential danger is lessened." (*Id.*; *see* Decl. of Dillard Hughes (Doc. 22-1 ¶¶ 4-5), a Major with the Gwinnett County Sheriff's Office ("GCSO") and the Support Section Commander at the Jail (*see* Hughes Decl. ¶ 2)). Defendants note that there is no blanket prohibition against viewing news shows at the Jail, although inmates may not watch any news show unless the Jail Administrator has pre-approved it for viewing.  (Doc. 22 at 5 n.2; *see* Hughes Decl. ¶ 4 & Ex. 1). Defendants also note that inmates "can get updates on world and local news from visitors or magazines, so there is an alternative means of exercising the asserted right." (Doc. 22 at 6).

Defendants make a similar argument for prohibiting inmate newspaper subscriptions, which they do "for a variety of reasons, the primary of which is inmate safety.  Newspapers often have coverage of crimes allegedly committed by inmates housed" at the GCDC, which if read by other inmates "could expose inmates . . . and . . . Sheriff's Office personnel to danger." (*Id.* at 7-8; *see* Hughes Decl. ¶ 6). Defendants note that Plaintiff "is charged with murdering a baby, and his case has received newspaper coverage, including heinous allegations aside from the murder

6

charge. If those allegations were widely known it could put [Plaintiff] and Jail personnel in danger because of the potential for retaliation by other inmates." (Doc. 22 at 8; *see* Hughes Decl. ¶ 6 & Ex. 2).

After an article appeared in USA Today describing how a GCDC inmate had poisoned three husbands with antifreeze, the GCSO stopped allowing subscriptions to that newspaper because the dissemination of such stories "could result in a ripple effect of requiring more single inmate cell space and additional personnel, neither of which the Sheriff's Office has the budget for." (Doc. 22 at 8; *see* Hughes Decl. ¶¶ 7-8). Defendants add that newspapers present a greater fire hazard than books or magazines, both of which are allowed at the GCDC; take up a lot of space, requiring extra time for cleaning inmates' cells, and inhibiting the movement of guards and medical care workers; and could be used by an inmate to clog a toilet, causing flooding and possibly damaging the Jail's sewage system. (Doc. 22 at 9; *see* Hughes Decl. ¶¶ 9-10).

> Any one of the reasons set out in the Hughes Declaration would be a sufficient penological interest sufficient to pass the Turner test. Taken together, the reasons establish that not allowing inmates to receive newspapers enhances inmate and Jail personnel safety, promotes orderliness in the Jail, and prevents potential issues with inmates attempting to cause disruption in the Jail. All of these are legitimate penological interests that would be undermined by accommodating the alleged "right" to receive newspapers. The court must give [] Jail officials [] broad discretion . . . and deny [Plaintiff's] motion for [an] injunction.

7

(Doc. 22 at 9-10).

Plaintiff replies that he is not seeking access to local news: "[T]his [is] all about the President, anything majority wise [sic] outside of Georgia[, i]ncluding other states[] and countr[ies]." (Doc. 25 ¶ 5). Plaintiff also notes that there are multiple sources of information about a particular GCDC inmate's offenses, which another inmate could access, for example, by observing the identifying information on the tag worn by that inmate and using one of the cell phones that are made available to inmates to discover information about that other inmate's offenses. (*Id.* ¶ 7). Plaintiff also denies that GCDC inmates are allowed to receive "world or local news magazines," and he claims he could produce over 50 declarations to that effect if he would not get into trouble for doing so. (*Id.* ¶ 8). He does appear to acknowledge, however, that books and magazines are allowed at the GCDC. (*See id.* ¶ 12). Plaintiff argues generally that the alleged justifications for denying newspaper subscriptions—to maintain an orderly and secure environment and to prevent fires and flooding—are an exaggerated response to these alleged potential problems and to the remote possibility that an article will appear in a national newspaper reporting on the crimes of a GCDC inmate. (*Id.* ¶¶ 9-13).

"A preliminary injunction is an extraordinary and drastic remedy not to be granted until the movant *clearly* carries the burden of persuasion as to the four

8

prerequisites." *Martin*, 225 F. Supp. 2d at 1372 (quotations omitted) (emphasis added). Here, given the various penological interests that Defendants cite to justify the Jail regulations regarding access to television news and newspapers, which concerns are at a minimum not patently illegitimate or exaggerated, Plaintiff has not *clearly* carried his burden of persuasion as to his substantial likelihood of success on the merits of this claim. *See Perry v. Fla. Sec'y Dep't of Corr.*, 664 F.3d 1359, 1366, 1368 (11th Cir. 2011) (applying *Turner* test; concluding that the Florida Department of Corrections had "shown a rational relationship between the legitimate penological interests of protecting the public and ensuring internal prison security and the Rule prohibiting inmates from soliciting for pen pals"; and granting summary judgment to the Department on appellants' First Amendment claim). And because, as Defendants point out, Plaintiff has other potential sources of information about world news events aside from television news shows and newspapers, he also has failed to carry his burden of persuasion on the irreparable-harm prong of the preliminary injunction test. Plaintiff's request for a preliminary injunction regarding his access to world news should therefore be denied.

### B.     Return Of Incoming Mail

With respect to Plaintiff's claim alleging that items in his incoming mail have

9

been returned to sender without notice, Defendants respond that "whenever any item of mail is returned to sender, the inmate is notified by [receiving] a 'Gwinnett Detention Center Returned Mail Notification,' " which "notifies [the inmate] that if he disagrees with the mail being returned he can file a grievance to appeal the decision." (Doc. 22 at 10). In fact, Plaintiff attached such a notification to his complaint. (*Id.*; *see* Hughes Decl. ¶¶ 12-14 & Exs. 3-4). Defendants argue that because Plaintiff did not appeal that or any other decision to return his incoming mail to the sender, "he does not have a substantial likelihood of success on his motion for injunction claim, and [the] court must deny the motion. Analysis of the Turner factors is unnecessary because of [Plaintiff's] failure to exhaust administrative remedies." (Doc. 22 at 12; *see* Hughes Decl. ¶ 15).

Plaintiff replies that although Defendants' evidence shows "one correct denial," there were others, and his alleged failure to exhaust administrative remedies is due to the refusal of GCDC officials to process his grievances and therefore is not attributable to him. (Doc. 25 ¶¶ 14-16).

Based on the "one correct denial" of incoming mail to which Plaintiff admits, it is apparent that to enforce a preliminary injunction to monitor all incoming mail to ensure that no further violations of the Jail's own policies occur in this regard would

10

impose a significant burden on Defendants and would not be in the public interest of allowing state agencies, including and perhaps especially state prisons and county jails, to conduct their own affairs without interference from the federal courts via preliminary injunctive relief. *See Martin*, 225 F. Supp. 2d at 1372 (noting that a "well-established rule bars federal courts from interfering with non-federal government operations in the absence of facts showing an immediate threat of substantial injury" (internal quotations omitted)). Plaintiff's request for a preliminary injunction on this issue should be denied because he has not presented "facts showing an immediate threat of *substantial* injury." *See id.* (emphasis added); *see also Turner*, 482 U.S. at 89 ("Prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations" (internal quotations omitted)).

### C. Postcard-Only Policy For Incoming Mail

Regarding Plaintiff's objection to the Jail's postcard-only policy for incoming mail, Defendants respond that the reasons for the policy are

> related to jail security and thus are legitimate penological interests. By limiting the space in which inmate and others can converse, the policy by its nature impedes the ability to conceal illegal schemes in long correspondence, such as escape plans, and plans to introduce illegal items and contraband into the Jail. Inmate receipt of contraband has and will continue to be an issue at the Gwinnett County Jail and every jail. The postcard policy makes it near impossible to transmit contraband through

11

the mail.

> Additionally, the policy conserves limited jail resources because personnel [are] not required to open and sort every piece of mail that comes into the Jail. This allows personnel to spend time on activities that better serve the Jail's goal of providing a safe facility for both inmates and Jail employees. Allowing multi-page sealed letters would significantly increase the time spent processing mail, which would detract from time spent on responsibilities that ensure a safe and secure Jail.

(Doc. 22 at 12-13; *see* Hughes Decl. ¶ 17). Defendants argue that the postcard-only policy easily passes the *Turner* test because it

> is directly connected to jail security and conserving jail resources, both of which are legitimate penological interests. Inmates are not being prohibited from getting any mail; rather, they are simply required to receive it in a certain form. So the court does not need to consider whether there is an alternative means of exercising the asserted right, since [Plaintiff] is already able to exercise the right to receive mail.

(Doc. 22 at 13).

Plaintiff replies that the policy is an exaggerated response to an alleged problem with non-postcard incoming mail, as courts all across the country have ruled; "Defendants read all post cards, and open and search all privileged mail already"; a civilian work force operates the mail room, so that the issue of how much time is needed to handle regular mail "is not a reasonable reason for the policy"; "no one is at risk if G.C.D.C. does there [sic] job and stops being lazy"; and "inmates who are

12

sexual predators have access to view and prey on the post-card (pictures)." (Doc. 25 ¶¶ 17-19).

Plaintiff has not met any of the requirements for a preliminary injunction with respect to this claim. At a minimum, he has suffered no irreparable injury to his ability to communicate with the outside world. And Defendants have offered several legitimate penological concerns to justify the Jail's postcard-only policy for incoming mail. Plaintiff thus has not *clearly* demonstrated a substantial likelihood of success on the merits of this claim.

### D. Sleep Deprivation

Plaintiff also seeks a preliminary injunction regarding the daily schedule at the Jail, which allegedly denies him an uninterrupted six hours of sleep. (Doc. 10 at 2). For there to be a violation of the Eighth Amendment constituting cruel and unusual punishment, "[f]irst, there must be, objectively speaking, conduct by public officials sufficiently serious to constitute a cruel or unusual deprivation—one denying the minimal civilized measure of life's necessities. Second, there must be a subjective intent by the public officials involved to use the sufficiently serious deprivation in order to punish." *Taylor v. Adams*, 221 F.3d 1254, 1257 (11th Cir. 2000) (citations and internal quotations omitted).

13

Plaintiff alleges just such a violation with respect to the time he is given for uninterrupted sleep. He alleges that lights out at the GCDC occurs at 12 midnight, and "sometimes there is a standing count then. [He] then is woken up between 3:30 [and] 4 am for breakfast. . . . [and] again for standing count around 7:40 am." (Doc. 10 at 2). Plaintiff seeks a preliminary injunction requiring that the GCDC inmate population be given a minimum of "6 hours of undisturbed sleep, at night. And to change the meal pattern. Currently it is 3:30-4 am breakfast, 12:30 pm lunch, and 4:00-4:30 pm dinner." (*Id.*).

Defendants respond that Plaintiff failed to exhaust his administrative remedies with respect to this claim and that even if he is allowed to proceed on the claim, no Supreme Court, Eleventh Circuit or Georgia case "require[s] a jail to give inmates a particular number of consecutive hours of sleep during a particular time of the day," and because this is the relief that Plaintiff seeks, he has no substantial likelihood of success on the merits. (Doc. 22 at 14). Defendants also argue that Plaintiff has failed to satisfy the subjective component of an Eighth Amendment deliberate indifference claim because he has not alleged that any of the Defendants "were aware of [his] sleep deprivation complaints, much less that they were deliberately indifferent to the complaints." (*Id.* at 15).

14

Defendants note that Plaintiff "is able to get more than six uninterrupted hours of sleep per night if he chooses. . . . Final lights out at the Jail is at 12:00 a.m., although an inmate can go to sleep before 12:00 a.m. if he chooses." (*Id.*; *see* Hughes Decl. ¶¶ 18-19, Ex. 5). Breakfast is served between 4 and 5 a.m. to allow prisoners who have court appearances to arrive at the courthouse by 8 a.m., when court hearings sometimes begin. An inmate may sleep through breakfast. (Doc. 22 at 16).

> After dinner and before lights out, inmates are not regularly scheduled for any required activities, and can sleep at any time after dinner up until breakfast the next morning. Inmates if they choose can sleep many more than six hours each day. An inmate can go to sleep before lights out and get at least six hours of sleep at night, even assuming the inmate is woken up every day at 4:00 a.m.

(*Id.*; *see* Hughes Decl. ¶¶ 20-23). Defendants argue that "[i]nmates simply do not have the right to dictate a jail's schedule, and unless the jail schedule amounts to a violation of constitutional rights, a court should not disturb it." (Doc. 22 at 17). "A jail schedule is a classic case of something that should be left to the administrators, not the inmates or a court, to best determine. Here, there is no evidence that inmates are being deprived of sleep at the Jail, and the court should deny [Plaintiff's] motion for injunction on this claim." (*Id.*).

Plaintiff replies that he did try to exhaust his administrative remedies on this

15

claim but was intimidated by threats and retaliation from doing so. (Doc. 25 ¶ 20). He states that lights out occurs at 12:00-12:30 a.m., depending on the standing count, and wake-up for breakfast takes place at 3:30-4:00 a.m., forcing him to choose between eating and sleeping, which deprives him of one or the other of life's basic necessities. Plaintiff notes that if an inmate attempts to sleep before lights out by covering his face with his blanket or not standing for count, he will be sent to segregation. (*Id.* ¶¶ 21-24). Plaintiff notes that few inmates go to court on Saturday and none on Sunday, and during the week they wait in the holding pen from 6 to 8 a.m. for the 3-mile trip to the courthouse, where court begins at 9, not 8, a.m. (*Id.* ¶ 25).

As with respect to his First Amendment claims, Plaintiff has not overcome the Defendants' arguments to the extent necessary to *clearly* establish a substantial likelihood of success on the merits. Given the severe disruption of Jail operations that granting Plaintiff's request for a preliminary injunction on this claim would entail, this issue is better left for disposition after full briefing and presentation of evidence. *See Martin*, 225 F. Supp. 2d. at 1372; *see also Turner*, 482 U.S. at 89 ("Prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations" (internal quotations omitted)). In sum, none of Plaintiff's claims warrants preliminary injunctive relief.

### III. **Plaintiff's Motion for Mandamus Relief**

Plaintiff alleges that he has been placed in administrative segregation and isolated for most of each day in retaliation for, among other things, initiating this lawsuit and moving for a preliminary injunction, and he seeks mandamus relief ordering Defendants to return him to the Jail's general population. (Doc. 29). This Court, however, may not order mandamus relief against state or county officials.

"Mandamus is an extraordinary remedy and will not lie if other remedies are available." *Lifestar Ambulance Serv. v. United States*, 365 F.3d 1293, 1298 (11th Cir. 2004). This Court's original mandamus jurisdiction extends only to an action "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." 28 U.S.C. § 1361. Another potential source of this Court's mandamus authority—the All Writs Act, 28 U.S.C. § 1651—"creates no jurisdiction," but instead empowers a federal district court to issue "all writs necessary or appropriate in aid of" its "jurisdiction previously acquired on some other independent ground." *Brittingham v. Comm'r*, 451 F.2d 315, 317 (5th Cir. 1971). As none of the foregoing prerequisites for mandamus relief apply here, Plaintiff's motion for mandamus relief should be denied.

### IV. **Plaintiff's Miscellaneous Motions**

17

Plaintiff has filed a motion for appointment of counsel (Doc. 20), his second; a motion for additional time to complete the payment of his initial partial filing fee (Doc. 21) and a separate motion regarding the periodic payment of his monthly partial filing fee (Doc. 31); a motion for assistance in obtaining photocopies (Doc. 23) and a motion for the Court to provide copies of "everything since review from judge to, Plaintiff and Defendants [sic]" (Doc. 26); a motion for a discovery period (Doc. 35); and a motion to supplement his complaint (Doc. 36).

Plaintiff's motions regarding the payment of his filing fee (Docs. 21, 31) are **moot** because he has paid installments of $50.00 and $144.00 toward the $350.00 that he owes. (*See* Unnumbered Docket Entries for Jan. 30 and Apr. 8, 2015). Plaintiff's motions for appointment of counsel and for discovery (Docs. 20, 35) are **premature**, pending the District Judge's ruling on the undersigned's two Reports and Recommendations, including this one. With respect to Plaintiff's requests for copies (Docs. 23, 26), he must submit to the Clerk of Court a request for specific documents, and only after the Clerk sends Plaintiff a bill for the copies he seeks – and Plaintiff has paid the bill – will the Clerk provide Plaintiff with those copies. Because Plaintiff has not attached an amended complaint to his motion for leave to supplement his complaint (Doc. 36), leave should not be granted.

18

## V. Conclusion

For the reasons stated in Sects. II.-III. above, **IT IS RECOMMENDED** that Plaintiff's motions for preliminary injunctive relief (Doc. 6; Doc. 10 at 2) and for mandamus relief (Doc. 29) be **DENIED**.

And for the reasons stated in Sect. IV. above, **IT IS ORDERED** that Plaintiff's remaining motions (Docs. 20, 21, 23, 26, 31, 35, 36) are **DENIED**.

**SO RECOMMENDED and ORDERED** this <u>18th</u> day of <u>June</u>, 2015.

           /s/ *J. CLAY FULLER*
           J. CLAY FULLER
           United States Magistrate Judge