IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| ADAM GARBER | ) | |
| Gwinnett County ID # 99499879, | ) | |
| | ) | |
|     Plaintiff | ) | CIVIL ACTION FILE |
| | ) | NO: 1:15-CV-00123-AT-JCF |
| vs. | ) | |
| | ) | |
| SHERIFF BUTCH CONWAY, | ) | |
| COL. DON PINKARD, and | ) | |
| MAJOR DILLARD HUGHES, | ) | |
| | ) | |
|     Defendants | ) | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S COMPLAINT

Defendants Butch Conway, Don Pinkard, and Dillard Hughes ("defendants") file this brief in support of their motion to dismiss plaintiff's complaint and show the court the following:

## Facts/claims alleged by plaintiff

Plaintiff Adam Garber ("Garber") is an inmate at the Gwinnett County Jail ("Jail"). He is charged with murder and child cruelty for allegedly shaking to death his 2-year old son. Doc. 37. He has been in the Jail since December 2013. Doc. 37. During his time at the jail, Garber has complained about a litany of things, most of which are set out in his lawsuit.

In his complaint Garber alleges a laundry list of constitutional violations. The remaining claims relate to: 1) lack of access to newspapers and television news, 2) the Jail's practice of returning to sender mail that does not comply with the Jail mail policy, 3) the Jail's policy of allowing only postcards for incoming mail, and 4) sleep deprivation. Garber seeks both injunctive/declaratory relief, and compensatory and punitive damages against each defendant in both their official and individual capacities. Doc. 4, paragraphs 7, 24-26. For the reasons set out below, the court should dismiss all of Garber's claims.

## Argument and Citation of Authority

I. The legal standard on a motion to dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 is to "give the defendant fair notice of what the … claim is and the ground upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). When considering a Rule 12 motion to dismiss, a court decides if a complaint contains "enough facts to state a claim to relief that is plausible on its face. Id., at 570. "All well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n. 1 (11th Cir. 1999). However, a court

is not required to construe all legal conclusions in the light most favorable to the plaintiff.  Sinaltrainal v. Coca-Cola Co., 578 F.3d 1252, 1260 (11th Cir. 2009).

A plaintiff's complaint must be more "than an unadorned, the defendant unlawfully harmed me accusation."  Ashcraft v. Iqbal, 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id.  This reasoning had previously been adopted in the 11th Circuit.  See Davila v. Delta Air Lines, Inc., 326 F.3d 1183, 1185 (11th Cir. 2003) ("conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal").

Here, the facts pled by plaintiff, even if true, do not entitle him to relief, because: 1) the 11th Amendment bars his claims for money damages against defendants in their official capacities,  2) the Prison Litigation Reform Act bars plaintiff's claims for compensatory and punitive damages, 3) defendants are entitled to qualified immunity on plaintiff's claims for monetary damages against them in their individual capacities, and 4) injunctive relief is not warranted even assuming as true the facts alleged in plaintiff's complaint.

II.   The legal standard for evaluating prison/jail regulations

As a starting point, "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform."  Procunier v. Martinez, 416 U.S. 396, 405 (1974).  "Subjecting the day-to-day judgments of prison officials to

an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." Turner v. Safley, 482 U.S. 78, 89 (1987). A court is required to give considerable deference to "the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." Thornburgh v. Abbott, 490 U.S. 401, 408 (1989).

The United States Supreme Court concluded in Turner that a content-neutral prison regulation will pass constitutional scrutiny if the regulation "is reasonably related to legitimate penological interests." Turner, at 89. The Court outlined a four-factor test to determine if a regulation is related to a legitimate penological interest: 1) whether there is a valid and rational connection between the regulation and the asserted interest; 2) whether there are alternative means of exercising the asserted right; 3) any effect accommodating the right would have on guards and inmates, and on the allocation of prison resources generally; and 4) the absence or existence of ready alternatives. Id., at 90.

Importantly, the inquiry is not whether a policy actually serves a penological interest. The inquiry is whether it is rational for a jail official to believe the policy would serve a penological interest. The Turner test is also not a least restrictive alternative test. In other words, jail officials do not have to come up with the

absolute best way to address every inmate complaint. Rather, they are only required to articulate a reasonable penological interest. Turner, at 90-91.

III.   **The 11th Amendment bars plaintiff's claims for monetary damages against defendants in their official capacities.**

The 11th Amendment protects a State from being sued in federal court without the State's consent. Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003)(en banc). It is well-settled that the 11th Amendment bars suits not only against the State itself, but also against an "arm of the State." Id., citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280 (1977).

Generally speaking, a Georgia sheriff sued in his official capacity functions as an "arm of the state." Manders, at 1305. A sheriff may not necessarily be a state actor for all functions, but in Manders the 11th Circuit determined that a sheriff's "authority and duty to administer the jail in his jurisdiction flows from the State, not [the] County." Id., at 1315. Here, the matters plaintiff complains about (mail policy, TV-watching policy, etc.) involve administration of the jail, and in fact, plaintiff admits in his complaint that Sheriff Conway is "responsible for the overall operations of… the Gwinnett County Detention Center. Doc. 4, Par. 4. As related to the claims in this case Sheriff Conway is an arm of the State, and is entitled to 11th Amendment immunity from plaintiff's claims for monetary damages against him in his official capacity.

Col. Pinkard and Maj. Hughes, as employees of Sheriff Conway, are also entitled to 11th Amendment immunity.  See Scruggs v. Lee, 256 Fed.Appx. 229, 232 (2007)("As employees of the sheriff, deputies … in their official capacities, are also entitled to Eleventh Amendment immunity.").

IV.   The Prison Litigation Reform Act bars plaintiff's claims for compensatory and punitive damages

Plaintiff's claims for compensatory damages and punitive damages are also barred by the Prison Litigation Reform Act ("PLRA"), which provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury while in custody without a prior showing of physical injury."  42 U.S.C. § 1997e(e).

In the 11th Circuit, Section 1997e(e)'s physical injury requirement applies to all federal actions, including First Amendment-related claims.  See Logan v. Hall, 2015 WL 1262152, p. 2 (11th Cir., March 20, 2015) (In case alleging First Amendment violations, 11th Circuit held "[W]e have held that Harris and its progeny determined that § 1997e(e) foreclosed claims for both compensatory and punitive damages"); Jackson v. Hill, 569 Fed.Appx. 697. 698-99 (11th Cir. 2014). A prisoner cannot recover compensatory or punitive damages in a First Amendment case where he does not allege a physical injury.  Jackson, at 699.

Here, Garber has not alleged any physical injury, so the PLRA bars his claims for compensatory and punitive damages.

V.   <u>Qualified immunity bars plaintiff's claims for monetary damages against defendants in their individual capacities.</u>

Qualified immunity is an affirmative defense to a Section 1983 lawsuit against a government employee sued in his individual capacity, and "protects government officials performing discretionary functions from civil trials … and from liability if their conduct violates no clearly established statutory of constitutional rights of which a reasonable person would have known." <u>Lassiter v. Alabama A& M Univ. Bd. of Trustees</u>, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting <u>Harlow v. Fitzgerald</u>, 103 S.Ct. 2727, 2738 (1982)).

In deciding if qualified immunity applies, a court must determine: 1) if the allegations in the complaint would establish the violation of a constitutional right, and 2) if so, whether that right was clearly established under the facts and circumstances alleged in the complaint. <u>Keating v. City of Miami</u>, 598 F.3d 753, 762 (11th Cir. 2010).   To overcome qualified immunity, it is the plaintiff's burden to show a violation of clearly established law.  <u>Barts v. Joyner</u>, 865 F.2d 1187, 1190 (11th Cir. 1989).   The law is established for qualified immunity purposes by decisions of the United States Supreme Court, the 11th Circuit court of Appeals, or the Georgia Supreme Court.  <u>Jenkins v. Talladega City Bd. of Educ.</u>, 115 F.3d 821, 823 n.4 (11th Cir. 1997).

In determining whether the law is clearly established, a court must look at whether the law at the time of the action gave "fair and clear warning" to a

reasonable person that their actions were unconstitutional.   Hope v. Pelzer, 536 U.S. 730, 746 (2002).   The 11th Circuit in Jenkins (quoting Lassiter, 28 F.3d 1146, 1150) (11th Cir.1994)) stated it more bluntly:  "[f]or qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances."   Jenkins, 115 F.3d at 823.   Qualified immunity is an entitlement not to stand trial or face the usual burdens of litigation, so courts must resolve the issue "at the earliest possible stage in litigation.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985).

To be eligible for qualified immunity, a defendant must first demonstrate that he was a public official acting within the scope of his discretionary authority. Rich v. Dollar, 841 F.2d 1558, 1563-64 (11th Cir. 1988).   Here, this is demonstrated by plaintiff's own complaint.  Plaintiff states that Sheriff Conway "is legally responsible for the overall operations of the Gwinnett County Sheriff's Department, and including under it's jurisdictions, the Gwinnett County Detention Center."  Doc. 4, Par. 4.  Similarly, plaintiff states that Col. Pinkard "is responsible for the overall operations of the Gwinnett County Detention Center and for the welfare of all the inmates/pre-trial detainee's in that facility…"  Doc. 4, Par. 5. Finally, plaintiff states that Maj. Hughes "is in charge of Jail operations and is

legally responsible for the operations of the Gwinnett County Detention Center…"
Doc. 4, Par. 6.  Plaintiff has admitted that defendants are public officials acting
within the scope of their discretionary authority, and thus the burden shifts to
plaintiff to show that they are not entitled to qualified immunity.

Here, plaintiff has not alleged any controlling law that would give
defendants "fair and clear warning" that any of their actions[1] were unconstitutional.
Plaintiff alleges the following constitutional claims: 1) lack of access to
newspapers and television news, 2) the Jail's practice of returning to sender mail
that does not comply with the Jail mail policy, 3) the Jail's policy of allowing only
postcards for incoming mail, and 4) sleep deprivation.

But defendants have searched decisions of the United States Supreme Court,
the 11th Circuit court of Appeals, and the Georgia Supreme Court, and have not
found any case that would put them on notice that they would violate the
Constitution by not allowing an inmate access to world news print media, not
allowing an inmate to watch world news on TV, returning mail that does not
comply with jail policy, allowing only postcards for incoming mail, and adhering
to a daily schedule regarding inmates' breakfast, lights-out, and free time.

---

[1] For purposes of this qualified immunity analysis only, defendant will assume that
plaintiff has established that the defendants each actually personally took some
action that could subject them to liability if immunity did not apply.

Accordingly, defendants in their individual capacities are entitled to qualified immunity on plaintiff's claim for damages regarding those policies.

## VI.  <u>The court should dismiss plaintiff's claims for declaratory/injunctive relief</u>

The standard for permanent injunctive relief requires that a party show: (1) he has prevailed in establishing the violation of the right asserted in the complaint; (2) there is no adequate remedy at law for the violation of the right; and (3) irreparable harm will result if the court does not order injunctive relief. <u>Kimerling Truck Parts, Inc. v. City of Birmingham</u>, CV-04-CO-00767-S, 2005 WL 4157440 (N.D. Ala. Nov. 17, 2005) aff'd sub nom. <u>Kimerling Truck Parts, Inc. v. Feigelson</u>, 180 F. App'x 846, 2006 WL 1228700 (11th Cir. 2006) (citing <u>Alabama v. U. S. Army Corps of Engineers</u>, 424 F.3d 1117, 1128 (11th Cir. 2005); <u>O'Shea v. Littleton</u>, 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

The Supreme Court has observed that "[o]rdinarily ... the practical effect of [injunctive and declaratory] relief will be virtually identical." <u>Doran v. Salem Inn, Inc.</u>, 422 U.S. 922, 930–31, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975). "In order to receive declaratory or injunctive relief, plaintiffs must establish that there was a violation, that there is a serious risk of continuing irreparable injury if the relief is not granted, and the absence of an adequate remedy at law." <u>Bolin v. Story</u>, 225 F.3d 1234, 1242 (11th Cir.2000).

In considering plaintiff's request for declaratory/injunctive relief, the Court must also consider the PLRA, which provides:

> Prospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. The court shall not grant or approve any prospective relief unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right. The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.

18 U.S.C. § 3626(a).

The adverse impact on public safety of granting the relief sought by plaintiff is set out in the Declaration of Dillard Hughes, which defendants previously filed in response to Judge Fuller's order to respond to plaintiff's request for injunction. Doc. 22-1 (the "Hughes Declaration").

Defendants will address each of plaintiff's claims in turn, under the legal framework set out above.

A.   Garber does not have the right to watch world or any news shows.

Inmates do not have a constitutional right to watch television. See Scheanette v. Dretke, 199 F. Appx. 336, 337 (5th Cir. 2006); Elliot v. Brooks, 188 F.3d 518, 518 (10th Cir. 1999)(unpublished)("There is no constitutional right to watch television.").  For this reason alone Garber is not entitled to injunctive relief

regarding watching world news on TV.  Defendants are not required to let Garber watch TV at all.

And even assuming Garber did have the right to watch television, the Declaration of Dillard Hughes sets out a rational basis under <u>Turner</u> for generally not allowing inmates to watch news shows.[2]  News shows may have coverage of crimes allegedly committed by inmates housed in the jail.   Based on Hughes's experience, inmates charged with certain crimes (e.g. rape, child molestation, domestic violence, child abuse) can be in danger of harm from other inmates.  If inmates heard on news shows about these type crimes committed by other inmates, this could put the other inmates in danger.  By generally not allowing inmates to watch news on television, this potential danger is lessened.  Hughes Dec., Par. 4. Inmates are allowed to watch a variety of other non-news shows and sports on television.  <u>See</u> Hughes Dec., Par. 5.

The Jail's policy on viewing of news shows easily passes the <u>Turner</u> and PLRA tests.  Safety of the inmates is a paramount goal at any jail.  The policy here is directly connected to that goal, and thus is "reasonably related to legitimate penological interests."   Inmates can get updates on world and local news from

---

[2] Per the Jail Housing Unit Manual, there is not a blanket, no exceptions prohibition on viewing news shows.  Rather, "[I]nmates are not permitted to view local, national, or world news <u>unless prior approval has been granted by the Jail Administrator or his designee</u>." (emphasis added) <u>See</u> Hughes Dec., Par. 5.  For purposes of this motion, defendants will assume that Garber is under the impression that there is a blanket prohibition.

visitors or magazines, so there is an alternative means of exercising the asserted right (assuming there is a right to watch news shows on television, which defendants dispute).  And accommodating the "right" could have a negative effect on inmates and guards, because of the potential safety risks as asserted in the Hughes Declaration.

B.    Garber does not have the right to receive newspapers.

The following quote from the Thornburgh v. Abbott case perhaps best describes the danger that can generally be associated with incoming publications, and the deference that must be given to jail administrators:

> We deal here with incoming publications, material requested by an individual inmate but targeted to a general audience. Once in the prison, material of this kind reasonably may be expected to circulate among prisoners, with the concomitant potential for coordinated disruptive conduct. Furthermore, prisoners may observe particular material in the possession of a fellow prisoner, draw inferences about their fellow's beliefs, sexual orientation, or gang affiliations from that material, and cause disorder by acting accordingly. *413 See App. 22-23, 52, 59, 88; see generally Prisoners and the Law 3-14 I. Robbins (ed. 1988) (noting that possession of homosexually explicit material may identify the possessor as homosexual and target him for assault). As the Deputy Solicitor General noted at oral argument: "The problem is not ... in the individual reading the materials in most cases. The problem is in the material getting into the prison." Tr. of Oral Arg. 10. See also id., at 26; App. 10. In the volatile prison environment, it is essential that prison officials be given broad discretion to prevent such disorder.

Thornburgh, at 412.

Here, the Jail officials have determined that it will not allow inmates to receive newspaper subscriptions for a variety of reasons, the primary of which is inmate safety. Newspapers often have coverage of crimes allegedly committed by inmates housed in the jail, and if inmates read about other inmates being charged with certain crimes, this could expose inmates to danger, and also expose Sheriff's Office personnel to danger. Hughes Dec., Par. 6. Garber's case is a perfect example. He is charged with murdering a baby, and his case has received newspaper coverage, including heinous allegations aside from the murder charge. If those allegations were widely known it could put Garber and Jail personnel in danger because of the potential for retaliation by other inmates.

As another example, the Sheriff's Office used to allow subscriptions to the USA Today, but stopped allowing those subscriptions after an article appeared in the paper about Lynn Turner, an inmate in the jail who had become of great interest to the media because she murdered three husbands by putting antifreeze in their food. Jail management did not want the general population to know the details of her charges because management feared other inmates may take offense to that type of crime. Hughes Dec., Par. 7.

If an inmate is identified by other inmates because of news coverage, the Jail would likely be forced to safeguard that inmate in protective custody. This would

require a one person cell and more security than is available.  Allowing newspapers into the Jail could result in a ripple effect of requiring more single inmate cell space and additional personnel, neither of which the Sheriff's Office has the budget for.  Hughes Dec., Par. 8.

Newspapers also present a fire hazard.  They are a great source of fuel for fires that could place every inmate and staff member in danger.  Based on Hughes's experience, the composition of newspapers makes them much easier to ignite than regular soft back books or magazines (both of which are allowed in the Jail).  Hughes Dec., Par. 9.

Newspapers also take up a lot of space.  Most newspapers publish seven days a week, which means the papers would quickly accumulate in inmates' cells. Inmate property items in cells are limited in number so that cells can be kept clean, orderly, and easy to search.  Accumulation of newspapers in a cell would require extra personnel time to clear out the papers, and cause difficulty for officers or medical personnel that need to be in the cell but would not be able to efficiently move around the cell because of the clutter.  Hughes Dec., Par. 10.

Additionally, the Jail often has problems with inmates who try to flush food wrappers or other items down the toilet, which creates flooding problems and even bigger problems in the system.  An accumulation of newspapers would give an inmate who wants to cause disruption an easy and large item to put in his toilet and

cause flooding and even damage to the sewer system in the Jail.  Hughes Dec., Par.

10.

Any one of the reasons set out in the Hughes Declaration would be a
sufficient penological interest sufficient to pass the Turner and PLRA tests and
defeat plaintiff's request for declaratory/injunctive relief.  Taken together, the
reasons establish that not allowing inmates to receive newspapers enhances inmate
and Jail personnel safety, promotes orderliness in the Jail, and prevents potential
issues with inmates attempting to cause disruption in the Jail.  All of these are
legitimate penological interests that would be undermined by accommodating the
alleged "right" to receive newspapers.  The court must give the Jail officials the
broad discretion referenced in Thornburgh, and deny Garber's motion for
injunction.

C.   The Jail's return to sender mail policy is constitutional, and Garber
has not exhausted his administrative remedies regarding any
complaints he has about the policy.

Inmate mail is governed by Jail Policy Number 13.A .  Hughes Dec., Par.

12, Ex. 3.  Garber states in his complaint that sometimes items mailed to him are
returned to sender without prior notice to Garber.  But whenever any item of mail
is returned to sender, the inmate is notified by receipt of a "Gwinnett Detention
Center Returned Mail Notification."   In fact, Garber attached a Notification as an
exhibit to his complaint (Ex. 4 to Hughes Declaration; Notification is also

Document 12-1, page 1 of 10).  The Notification is addressed to Garber and dated, notes his housing unit number, lists the specific item that was returned, the reason why it was returned, and notifies Garber that if he disagrees with the mail being returned he can file a grievance to appeal the decision.

This is exactly how the process works.  Garber could have appealed the decision to return this mail item or any other decision to return other mail.  But his complaint does not allege that he appealed, and the Hughes Declaration further establishes that Garber has not appealed any decisions to return mail items to sender (See Hughes Dec., Par 15).  For this reason alone, his injunction claim fails, because of failure to exhaust administrative remedies.

Under the PLRA, a prisoner must exhaust all available administrative remedies, not just those that meet federal standards, before he can file a lawsuit challenging prison conditions.   Woodford v. Ngo, 548 U.S. 81, 85 (2006). Specifically, 42 U.S.C. § 1997e(a) of the PLRA mandates the following:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Here, there is obviously an administrative remedy.  Document 12-1, attached to Garber's own complaint, clearly states:  "If you do not agree with your mail being returned, please fill out a pre grievance form and forward to the Inactive

Records Supervisor." Garber knows how to file a grievance, as demonstrated by the at least 12 formal grievances he has filed during his time at the Jail. But he has not exhausted his remedies regarding the return to sender policy. Because Garber has not exhausted his remedies, he does not have a substantial likelihood of success on his declaratory/injunctive relief claims, and the court must dismiss them. Analysis of the <u>Turner</u> factors is unnecessary because of Garber's failure to exhaust administrative remedies.

      D.    <u>The Jail's post-card only policy for incoming mail is constitutional</u>

Defendants are not aware of any court in the 11th Circuit having found a jail or prison post-card only policy to be unconstitutional. For this reason alone, the court should dismiss his claim for injunctive/declaratory relief, because he does not have a substantial likelihood of success.

Factually, the Hughes Declaration in Paragraph 17 sets out a variety of reasons for the post-card only policies, all of which are related to jail security and thus are legitimate penological interests. By limiting the space in which inmate and others can converse, the policy by its nature impedes the ability to conceal illegal schemes in long correspondence, such as escape plans, and plans to introduce illegal items and contraband into the Jail. Inmate receipt of contraband has and will continue to be an issue at the Gwinnett County Jail and every jail.

The postcard policy makes it near impossible to transmit contraband through the mail.

Additionally, the policy conserves limited jail resources because personnel are not required to open and sort every piece of mail that comes into the Jail.   This allows personnel to spend time on activities that better serve the Jail's goal of providing a safe facility for both inmates and Jail employees.   Allowing multi-page sealed letters would significantly increase the time spent processing mail, which would detract from time spent on responsibilities that ensure a safe and secure Jail. Hughes Dec., Par. 17.

Again, the reasons set for the post-card only policy set out in the Hughes Declaration easily pass the <u>Turner</u> and PLRA tests.   The policy is directly connected to jail security and conserving jail resources, both of which are legitimate penological interests.   Inmates are not being prohibited from getting <u>any</u> mail; rather, they are simply required to receive it in a certain form.   So the court does not need to consider whether there is an alternative means of exercising the asserted right, since Garber is already able to exercise the right to receive mail. And accommodating Garber's desire to receive sealed mail could put jail personnel at increased risk, because of the potential for increased amounts of contraband to be introduced into the jail.   The post-card only policy is constitutional, and the court should deny Garber's motion for injunction.

E.   Garber is not being deprived of sleep, and has not exhausted all available administrative remedies regarding any sleep deprivation claim.

At most, Garber has alleged that he filed a pre-grievance about sleep deprivation. See Doc. 10, Par. 5. The Jail has a formal grievance process, which Garber has used many times, but has not used regarding his sleep deprivation claim. The United States Supreme Court has ruled that a prisoner must exhaust all available remedies before he can file a lawsuit challenging prison conditions. Woodford v. Ngo, at 85. Since Garber has not exhausted all his remedies, he does not have a substantial likelihood of success, and the court must dismiss his request for declaratory/injunctive relief.

Garber's request for declaratory/injunctive relief still fails even assuming the court allows him to proceed without having exhausted all available remedies. Defendants have not located any U.S. Supreme Court, 11th Circuit, or Georgia cases that require a jail to give inmates a particular number of consecutive hours of sleep during a particular time of the day.   Since this is exactly what Garber seeks ("uninterrupted 6 hours of sleep at night"), his request fails because he does not have a substantial likelihood of success.

Finally, Garber does not have a substantial likelihood of success on his request for declaratory/injunctive relief because his complaint does not allege both the objective and subjective components required to establish an Eighth

Amendment violation.  To satisfy the objective component, a prisoner must show that the deprivation complained of "resulted in the denial of the minimal civilized measure of life's necessities."  Garrett v. Thaler, 560 Fed.Appx. 375, 378 (2014) (internal quotations omitted).  Garber's factual allegations, taken as true, perhaps barely cross the frivolity threshold of the objective component.

But to establish the subjective component, a prisoner must also show that "prison officials must have been deliberately indifferent to the alleged conditions and hence possessed a sufficiently culpable state of mind."  Id.  The prisoner in the Garrett case "repeatedly complained to the prison medical staff about the sleep deprivation," which was enough to at least plausibly give rise to a finding of deliberate indifference.  Garrett, at 380.  Here, there is no allegation that any of the defendants were aware of Garber's sleep deprivation complaints, much less that they were deliberately indifferent to the complaints.   Again, Garber does not have a substantial likelihood of success on his request for declaratory/injunctive relief, because he has failed to allege both components needed to make out an Eighth Amendment claim.

Garber is essentially seeking to mandate to the jail exactly when he sleeps and exactly how long he sleeps.   This is not a constitutional right, although as a factual matter Garber is able to get more than six uninterrupted hours of sleep per night if he chooses.  Exhibit 5 of the Hughes Declaration sets out the typical daily

schedule for inmates.  Final lights out at the Jail is at 12:00 a.m., although an inmate can go to sleep before 12:00 a.m. if he chooses.      Hughes Dec., Par. 19. Breakfast is generally served from 4:00 a.m. to 5:00 a.m.  Every day a large number of inmates are transported from the jail to the County courthouse, which is several miles away.   Court can start as early as 8:00 a.m.   Serving breakfast at 4:00 a.m. is the most efficient time because it gives inmates who choose to eat breakfast time to eat, get prepared for transport, and arrive at the courthouse before court hearings start.  Hughes Dec., Par 20.   Inmates are not required to come out of their cells at breakfast time.   If an inmate chooses, he can continue sleeping during breakfast time.  Hughes Dec., Par. 21.

Lunch is served from 12:00 p.m. to 1:00 p.m.   Dinner is served from 4:00 p.m. to 5:00 p.m.   After dinner and before lights out, inmates are not regularly scheduled for any required activities, and can sleep at any time after dinner up until breakfast the next morning.  Hughes Dec., Par. 22.  Inmates if they choose can sleep many more than six hours each day.   An inmate can go to sleep before lights out and get at least six hours of sleep at night, even assuming the inmate is woken up every day at 4:00 a.m.   If an inmate chooses to remain in his cell at breakfast time he could sleep in excess of eight hours every night even if he did not go to sleep until lights out time at 12:00 a.m.  Hughes Dec., Par. 23.

Scheduling is a vital and legitimate penological interest related to the orderly running of the Jail.  Inmates simply do not have the right to dictate a jail's schedule, and unless the jail schedule amounts to a violation of constitutional rights, a court should not disturb it.  What if one group of inmates wanted to sleep six hours per day from 2:00 p.m. to 8:00 p.m. and stay up all night?  Would the Jail have to accommodate those inmates, as well as Garber?  Surely not, because having inmates up and about at all hours of the day could create security risks and require more Jail resources than are available.  A jail schedule is a classic case of something that should be left to the administrators, not the inmates or a court, to best determine.  Here, there is no evidence that inmates are being deprived of sleep at the Jail, and the court should dismiss Garber's claim for declaratory/injunctive relief.

## Conclusion

An inmate does not leave all his constitutional rights at the door of the jail.  But an inmate also does not have the right to run a jail.  That is the jail administration's job.  Here, Garber's damages claims are barred by the 11th Amendment, the PLRA, and qualified immunity, and his claims for declaratory/injunctive relief fail because he cannot meet the legal standard for this type relief, especially when the court analyzes the claims under the additional

framework of <u>Turner</u> and the PLRA.   The court should dismiss Garber's complaint.

Submitted this 23rd day of October, 2015.


/s/Duane D. Pritchett
Chief Assistant County Attorney
Georgia Bar No. 588330
Attorney for defendants

Gwinnett County Department of Law
75 Langley Drive
Lawrenceville, Georgia 30046-6935
(770) 822-8700

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

ADAM GARBER                           )
Gwinnett County ID # 99499879,        )
                                      )
        Plaintiff(s)                  )      CIVIL ACTION FILE
                                      )      NO: 1:15-CV-00123-AT-JCF
vs.                                   )
                                      )
SHERIFF BUTCH CONWAY,                 )
COL. DON PINKARD, and                 )
MAJOR DILLARD HUGHES,                 )
                                      )
        Defendants.

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 23, 2015 I electronically filed Defendants'
Brief In Support of Motion to Dismiss Plaintiff's Complaint with the Clerk of
Court using the CM/ECF system, which will automatically send electronic mail
notification of such filing to counsel of record who are CM/ECF participants, and
further certify that I have served Defendants' Brief In Support of Motion to
Dismiss Plaintiff's Complaint by mail to the following party:

Adam Garber
Gwinnett County Jail
2900 University Parkway NE
Lawrenceville, GA 30043
Gwinnett County ID # 99499879

This is to further certify that the foregoing document was prepared using 14 point Times New Roman Font.

This 23rd day of October, 2015.

*/s/Duane D. Pritchett*

Gwinnett County Department of Law
75 Langley Drive
Lawrenceville, Georgia 30046-6935
(770) 822-8700